Donald R. **COLEMAN, and International Magnaproducts, Inc., Appellants–Defendants,**

v.

Predrag **VUKOVICH, individually and as Agent, member and/or representative of Alliance, L.L.C., Appellees–Plaintiffs.**

No. 64A05–0409–CV–486.

Court of Appeals of Indiana.

April 12, 2005.

Steven M. Bush, Millbranth and Bush, Valparaiso, IN, Attorney for Appellants.

Michael A. Fish, Terrell & Thrall, LLP, Valparaiso, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

Predrag Vukovich worked for Donald Coleman at International Magnaproducts, Inc. (IMI), Coleman's company. With Coleman's blessing, Vukovich left to set up a new company, which serviced some of IMI's customers. As he began to attract new business, Vukovich refused to sign a covenant not to compete that would have allowed Coleman to sell IMI, and his refusal nixed the sale. This dispute led to three lawsuits presenting multiple claims. First, we affirm the trial court's grant of summary judgment to Vukovich on Coleman's claim that Vukovich should have signed the covenant not to compete. Vukovich had no legal duty to sign. Second, we affirm the trial court's grant of summary judgment to Vukovich on Coleman's claim that Vukovich unlawfully misappropriated trade secrets. The customer information in dispute was not a trade secret. Third, we reverse in part the trial court's denial of summary judgment to Vukovich on Coleman's claim that Vukovich converted or trespassed on Coleman's chattel and for replevin. Vukovich is entitled to summary judgment as to the RPMS[1] software he allegedly copied, but Coleman and IMI may still maintain an action relating to conversion, trespass, or replevin relating to customer files, a rotary file, and a laptop computer.

### Facts and Procedural History

Vukovich went to work for Coleman at IMI in 1996. IMI sold industrial magnets. Coleman has spent forty years in the magnet business. As a Purdue engineering graduate, Vukovich was well qualified to understand and sell IMI's products. Cole-

---

**1.** RPMS is the abbreviation for Rep Profit Management System, proprietary software manufactured by RPMS, LLC.

man mentored Vukovich in the business, and Vukovich became Coleman's right-hand man. Motivated by the defection of another sales person, Coleman obtained a "Non–Compete Agreement" from Vukovich in 1999.

By 2001, the situation at IMI had changed, although Vukovich and Coleman disagree about why. As of the end of 2001, Vukovich left IMI's employment and instead became a principal in two other ventures, Alliance, LLC, and Alliance Motors, LLC.[2] Coleman also was one of several investors in Alliance Motors, which was designed to market brushless DC motors to industrial customers.[3] Alliance, on the other hand, was assigned twenty-three of IMI's magnet customers for Vukovich to continue to service to generate revenue to cover Alliance Motors' costs. IMI and Alliance split profits on the twenty-three customers. Alliance and Alliance Motors rented space from Coleman across the street from IMI's facility, and Coleman gave Vukovich the information Vukovich needed to work on the customers' accounts.

Problems arose within a few months after Vukovich's departure. First, Coleman came to believe that Vukovich was handling the twenty-three customers' accounts, and perhaps additional accounts, in a manner that sometimes bypassed IMI and diverted revenue from IMI to Alliance. Second, Coleman had decided to sell IMI to Wally Radjenovic, who would not purchase IMI unless Vukovich executed a covenant not to compete. Vukovich declined to do so.

In early June 2002, Coleman locked Vukovich out of the offices Coleman had rented him. Vukovich had not paid the rent due for June. Vukovich and seven other individuals entered the offices (apparently through an unlocked door connecting to an adjoining office) and retrieved equipment and records.

The first litigation between the parties was *Alliance, LLC v. Coleman,* No. 64D01–0206–PL–5119, in which Alliance sought an injunction allowing Vukovich to re-enter the office space he rented from Coleman and determination of Alliance's rights under the lease. In this action, Coleman brought counterclaims against Alliance and a third-party claim against Vukovich alleging that they had committed conversion and trespass by re-entering the office space to retrieve various items that actually belonged to Coleman or IMI. Coleman and IMI also alleged that Alliance breached its lease and sought replevin.

Coleman and IMI then sued Vukovich and Alliance in No. 64D02–0207–PC–5726, alleging tortious interference with contractual relations as well as violations of the covenant not to compete and the Uniform Trade Secrets Act. In a previous appeal in this action, this court already determined that the covenant not to compete that Vukovich executed in favor of IMI was invalid because it contained no geographic limitation. *Vukovich v. Coleman,* 789 N.E.2d 520 (Ind.Ct.App.2003). In *Coleman v. Murphy,* No. 64D02–0207–PC–5727, Coleman and IMI sued the seven individuals

---

**2.** Coleman stated that Alliance Motors was formed to try to develop business in a new area because the magnet business was under siege from Chinese competition. Vukovich stated that he left IMI because of conflicts with Coleman's children, all of whom were employed in the business.

**3.** Brushless DC motors operate on direct current and run cleaner than other motors because they lack brushes to create carbon dust. Solid state switches replace the brushes, which make the connection between the armature and the commutator in ordinary DC motors.

who assisted Vukovich in re-entering the office space he leased from Coleman to obtain property that Coleman alleged to be his or IMI's; Coleman and IMI claimed conversion and trespass.

The trial court consolidated the three cases. Vukovich and Alliance sought summary judgment on the following claims: conversion; replevin; trespass to land; trespass to chattel; violation of the uniform trade secrets act; tortious interference with contractual relations; breach of covenant not to compete; and breach of contract.[4] The seven individuals charged with assisting Vukovich in converting and trespassing on property sought summary judgment on claims of conversion; replevin; trespass to land; and trespass to chattel. Coleman and IMI opposed summary judgment on each of these claims except for the allegation of breach of covenant not to complete, which had been determined by the previous appeal. Coleman and IMI argued that genuine issues of material fact precluded summary judgment on each claim.

In relevant part, the trial court's order is as follows:

> The Court being duly advised in the premises and after reading the submission of the parties and reading the authorities cited therein does now grant the defendants['] motion for Partial Summary Judgment.
>
> It is therefore ordered that the Judgment is entered for Defendants in Cause numbers 64D02–0207–PL–5726 and 64D02–0207–PL–5727 and against the Plaintiff. Matter to continue in Cause 64D02–0206–PL–5119 on Plaintiff's claim and Defendant's cross claim.

> In as much as this is a full and final determination of Plaintiff's claim in Causes 64D02–0207–PL–5726 and 64D02–0207–PL–5727 either party may take an appeal from this court's determination by filing the appropriate pleading pursuant to the rules of Appellate Procedure.

Appellant's App. p. 37. This order disposes of the claims by Coleman and IMI against Vukovich and Alliance alleging breach of covenant not to compete, violation of the Uniform Trade Secrets Act, and tortious interference with contractual relations (the claims in No. 64D02–0207–PL–5726) by granting judgment in favor of Vukovich and Alliance on all claims. Coleman and IMI appeal that judgment.

The trial court's ruling also disposes of Coleman and IMI's claims of conversion, trespass to land, and trespass to chattel against the individuals who assisted Vukovich, namely James Murphy, Ed Burchuk, Nena Vukovich, Diana Carr, Jeff Carr, Daniel Flieg and Mark Flieg by granting judgment in favor of defendants on all claims (the claims in No. 64D02–0207–PL–5727). Coleman and IMI have not appealed that portion of the ruling, so the judgment in favor of these seven individuals is final.

The trial court denied summary judgment, however, as to Coleman and IMI's claims in No. 64D01–0206–PL–5119 against Vukovich and Alliance alleging breach of contract, conversion, replevin, trespass to land, and trespass to chattel. Vukovich and Alliance cross-appeal denial of summary judgment on those claims.

### Discussion and Decision

■ The trial court's order neither decides all claims as to all parties nor recites

---

**4.** It appears that the motion by Vukovich and Alliance sought *partial* summary judgment because it sought the trial court's determination of all claims by Coleman and IMI against them but did not seek disposition of Vukovich's and Alliance's own claims against Coleman and IMI in No. 64D02–0206–PL–5119.

the language mandated by Trial Rule 56(C) that there is "no just reason for delay" and directing entry of judgment. *See, e.g., Ray–Ron Corp. v. DMY Realty Co.,* 500 N.E.2d 1163, 1165 (Ind.1986) ("Unless the trial court takes each of these steps, the decision is not an appealable order under Rule 56."). Nevertheless, the record reflects that the trial court clerk has entered judgment on Nos. 64D02–0207–PL–5726 and 64D02–0207–PL–5727, effectively ending the consolidation of these matters with No. 64D01–0206–PL–5119. Appellant's App. p. 34. The judgments in these two matters thus are appropriate for this court's review under Indiana Appellate Rules 2(H)(1) and 5(A), even though there has not yet been disposition of all claims as to all parties. *Cf.* Ind. Trial Rule 40 (governing consolidation).

■■■ The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. *Bushong v. Williamson,* 790 N.E.2d 467, 474 (Ind.2003). On appeal, our standard of review is the same as that of the trial court: summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Am. Home Assurance Co. v. Allen,* 814 N.E.2d 662, 666 (Ind.Ct.App. 2004), *trans. dismissed.* We construe all facts and reasonable inferences drawn from those facts in favor of the non-moving party. *Id.* On appeal, the trial court's order granting or denying a motion for summary judgment is cloaked with a presumption of validity. *Sizemore v. Erie Ins. Exch.,* 789 N.E.2d 1037, 1038 (Ind.Ct. App.2003). A party appealing from an order granting summary judgment has the burden of persuading the appellate tribunal that the decision was erroneous. *Id.* at 1038–39.

### I. Tortious Interference with Contractual Relations

■■■ Coleman argues that Vukovich tortiously interfered with Coleman's contractual relationship with Wally Radjenovic by declining to sign the covenant not to compete that Radjenovic required from Vukovich before he would purchase IMI. To show tortious interference with contractual relations, Coleman must prove: (1) the existence of a valid and enforceable contract; (2) the defendant's knowledge of the existence of the contract; (3) the defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful inducement of the breach. *Winkler v. V.G. Reed & Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind.1994).

Coleman's claim fails because there was no valid and enforceable contract between him and Radjenovic. Radjenovic's affidavit states that he had "reached the basics of an agreement" to buy IMI, but "one of the necessary elements of the purchase was the requirement that Predrag Vukovich execute a non-compete agreement" with Radjenovic. Appellee's App. p. 134. Coleman's own deposition testimony agrees: "we [had] come to an agreement, and the only contingency was that Dan [Vukovich] would work with Wally [Radjenovic] for the same contract that he had with me verbally, although Wally wanted his in writing and that we would pay him at the same rate, but he had to sign a letter not to compete." *Id.* at 147.[5] The

---

5. In his brief, Coleman describes Vukovich's execution of a covenant not to compete as a "contingency" in the contract between Coleman and Radjenovic. Appellant's Br. p. 8. In fact, even as Coleman describes the arrangement, the contract would not come into being

undisputed evidence thus shows that no contract was formed. *See Krieg v. Hieber,* 802 N.E.2d 938, 947 n. 3 (Ind.Ct.App.2004) (stating that valid contract requires offer, acceptance, consideration, and manifestation of mutual assent).

Moreover, Vukovich was under no duty to agree not to compete with Radjenovic. First, this Court already has determined that Vukovich's covenant not to compete with IMI was invalid. *Vukovich,* 789 N.E.2d at 526. It therefore could not extend to Radjenovic if he purchased IMI. Second, Coleman presents no legal reason Vukovich was required to enter into a covenant not to compete with Radjenovic. Coleman phrases his argument in terms of lack of justification for Vukovich's actions. To be unjustified, Vukovich's actions must "be malicious and exclusively directed to the injury and damage of another." *Morgan Asset Holding Corp. v. CoBank, ACB,* 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000). Vukovich's actions do not fit this definition. His decision not to agree to the covenant not to compete was motivated by his own business interest, which would have been injured if he had agreed to Coleman's request.

Coleman also argues that Vukovich's signature on a covenant not to complete would constitute only an "acknowledgement" of his arrangement with Coleman and IMI. Reply Br. p. 15. The invalidity of the covenant not to compete between Vukovich and IMI punctures this position. Because there was no lawful agreement between Vukovich and IMI, Vukovich could not "acknowledge" it.[6]

The trial court correctly determined that there was no genuine issue of material fact in relation to the tortious interference claim and that Vukovich and Alliance were entitled to judgment as a matter of law on the claim.

## II. Trade Secrets

The trial court also properly entered judgment in favor of Vukovich and Alliance on the trade secret claim. "[A] protectable trade secret has four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy." *N. Elec. Co. v. Torma,* 819 N.E.2d 417, 425 (Ind.Ct.App.2004), *reh. denied.* The Indiana Trade Secrets Act defines misappropriation of a trade secret as:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) used improper means to acquire knowledge of the trade secret;

(B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

---

absent Vukovich's agreement. Therefore, no valid and enforceable contract existed absent Vukovich's execution of a covenant not to compete.

**6.** Vukovich and Coleman also disagree on the terms under which Vukovich took the twenty-three IMI accounts to Alliance. Coleman viewed this arrangement as limited to representation of IMI to those clients, which would

be phased out after a period of about two years. Vukovich, in contrast, viewed Alliance as an independent business that could develop new clients. This factual issue need not be resolved to dispose of the claim of tortious interference because there was no valid and enforceable contract between Coleman and Radjenovic.

(i) derived from or through a person who had utilized improper means to acquire it;

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ind.Code § 24–2–3–2. In reviewing the trial court's judgment, we apply the standard of review for summary judgments, so it is incumbent upon Coleman to show that a genuine issue of material fact exists or that Vukovich otherwise is not entitled to judgment as a matter of law.

Coleman and IMI argue that Vukovich and Alliance improperly obtained customer information, which constitutes trade secrets. To be clear, Coleman argues that although "the names of IMI customers are not trade secrets, the other information contained in the customer files and records deserves protection." Appellants' Br. p. 12. Coleman argues that Vukovich obtained detailed customer information in order to service twenty-three of IMI's customers and then appropriated that information to advance his own business interests.

▆▆▆ Coleman and IMI failed to show that they took sufficient steps to maintain ·secrecy of the information at issue. Vukovich's designated evidence showed that the customer information at issue was available to all of IMI's employees; that it was kept in unlocked files and sometimes in open view; that computers containing the information were not password-protected; and that some customer identifying infor-

mation was posted in the office and not marked confidential. Also, although Vukovich was required to sign a covenant not to compete that included promises to keep customer information confidential, not all employees were required to sign such agreements.

▆▆▆ "[T]he question of what constitutes proprietary or trade secret information is a determination for the court to make as a matter of law." *Franke v. Honeywell, Inc.,* 516 N.E.2d 1090, 1093 (Ind.Ct.App.1987). In determining whether steps to maintain confidentiality are adequate to convey trade secret status, the court must look at specific facts. *Zemco Mfg., Inc. v. Navistar Int'l Transp. Corp.,* 759 N.E.2d 239, 246 (Ind.Ct.App.2001), *trans. denied.* Where a company keeps design documents in a secure area and maintains password protection on the computers storing the information, has its employees sign confidentiality agreements, marks some design documents as confidential, but takes no action to protect the confidentiality of design documents given to another company, information in the design documents is not a trade secret. *Flotec, Inc. v. Southern Research, Inc.,* 16 F.Supp.2d 992, 1004–05 (S.D.Ind.1998) (applying Indiana law). Where machinery is not visible from outside the building, an employee handbook instructs employees to keep information about the machinery confidential, signs are posted barring visitors from the machines' location and instructing employees not to disclose information about the machines, but there are no confidentiality agreements with employees or outsiders who see the machinery (including outsiders who were specifically shown the machines), the machinery's design is not a trade secret. *Zemco,* 759 N.E.2d at 249–50. In contrast, where a company limited access to its facility through a security system; limited access to informa-

tion by keeping it under lock and key and distributing it only on a limited basis to individuals who needed it; and depended on longstanding trusting relationships with employees rather than explicit confidentiality agreements, the company had taken reasonable steps to assure security so that the relevant information was a trade secret. *Torma*, 819 N.E.2d at 427–29.

The lax security at IMI and its haphazard approach to confidentiality agreements were insufficient to confer trade secret status on the customer information at issue in this case. Although Coleman may have subjectively believed that the customer information he gathered over his years in the magnet business constituted trade secrets, his and IMI's actions did not reflect that belief. Coleman and IMI took insufficient actions to protect the secrecy of the customer information to accord trade secret status to the information.

On the trade secret issue, Coleman and IMI argue primarily that the actions they took regarding Vukovich himself were sufficient to require Vukovich to keep the customer information secret. Because Vukovich signed a covenant not to compete (later invalidated) including an agreement to "retain ... as confidential ... trade secrets, customers, and other confidential data"—an agreement that Vukovich himself prepared—Coleman and IMI argue that Vukovich was restricted to using the customer information only for IMI's benefit, not for his own.

Vukovich's response to this argument is incomplete: he argues that he did nothing to misappropriate the customer information, but instead Coleman freely gave him the information and Vukovich shared it with no one else. When Coleman gave Vukovich the information, however, Coleman believed that Vukovich was bound by a valid written agreement to keep the information confidential and not use it for

his own purposes. When Coleman gave Vukovich the information, Coleman reasonably could have believed that Vukovich was legally bound not to use the information for purposes other than advancing IMI's interests.

But Coleman and IMI's argument regarding Vukovich is misdirected. It is an argument focused on contract principles—that Vukovich agreed to keep the information secret and use it only for IMI's benefit—although the contract has been invalidated. In the absence of a valid contract, Coleman and IMI can only succeed against Vukovich on this issue if the customer information is classified as a trade secret. Because IMI took insufficient steps to keep the information confidential, it is not a trade secret and the trial court's grant of summary judgment on this claim is not erroneous.

### III. Cross–Appeal Issues

Vukovich argues that the trial court should have granted summary judgment in his favor on three claims: conversion; trespass to chattel; and replevin. The subject matter of these claims is: (1) the customer files on twenty-three IMI customers that were given to Vukovich; (2) a rotary card file containing customer information; (3) a Sony laptop computer; and (4) RPMS software. There is no dispute that Coleman gave Vukovich these items around January 1, 2002. Coleman claims that he revoked his permission for Vukovich to have the items on June 6, 2002. Vukovich returned the items to Coleman on July 30, 2002. Coleman maintains that the laptop computer was returned with damage. He also maintains that, although Vukovich returned the customer files, rotary card file, and laptop computer, Vukovich pirated information from each of those sources, which he retained after giving the items back to Coleman.

[15, 16] The claims for conversion and trespass to chattel may be analyzed together. To prove conversion, Coleman and IMI must show that Vukovich knowingly or intentionally exerted unauthorized control over IMI's property. *Torma,* 819 N.E.2d at 429. To prove trespass to chattel, Coleman and IMI must show that (1) Vukovich dispossessed Coleman and IMI of their chattel; (2) Vukovich impaired their chattel's condition, quality, or value; (3) Vukovich deprived Coleman and IMI of the use of their chattel for a substantial time; or (4) Vukovich harmed some other thing in which Coleman or IMI had a legally protected interest. *Terrell v. Rowsey,* 647 N.E.2d 662, 666 (Ind.Ct.App. 1995), *trans. denied.*

■ Whether Coleman and IMI can maintain these claims depends entirely on whether Vukovich should have returned the items to IMI before July 30, 2002. Vukovich claims, for example, that he reasonably believed that IMI gave him the Sony laptop computer as a gift. Coleman categorically denies any statement that would support Vukovich's conclusion that the computer was a gift. The parties similarly dispute whether Vukovich should have returned, and should have known he should have returned, the other items before July 30, 2002. These factual disputes are material to whether Vukovich exercised unauthorized control for purposes of the conversion claim and whether he dispossessed or deprived Coleman and IMI of their property for purposes of the trespass claim.

■ These material factual disputes preclude summary judgment. If Coleman and IMI can show that Vukovich wrongfully retained items of their property beyond the authorized time and that Vukovich's action damaged them, they may be able to recover damages for Vukovich's actions. Under these theories, however, their damages are restricted to the effects of being deprived of the physical items. Because the information in the customer files, rotary card file, and laptop is not a protected trade secret, Coleman and IMI cannot recover damages for loss of this information through the "backdoor" route of claims for conversion or trespass.

■ While actions for replevin generally seek only the return of property wrongfully withheld, damages incidental to the withholding may also be recovered in a replevin action. *United Farm Family Mut. Ins. Co. v. Michalski,* 814 N.E.2d 1060, 1066 (Ind.Ct.App.2004). Because there is a factual dispute about whether Vukovich wrongfully withheld IMI's property, summary judgment is not appropriate (although it appears that any damages available relating to the claim for replevin would duplicate the damages for trespass or conversion).

■ The claims as to RPMS software must be considered separately because the claim is qualitatively different. Vukovich denies ever having had possession of the software, while Coleman and IMI present evidence from which they infer that Vukovich had the RPMS. While continuing to deny that he ever had the software, Vukovich argues that Coleman and IMI have no claim as to the RPMS because they do not own it, but they merely own a license to use it. In response, Coleman and IMI concede they do not own the software, and they admit that they were never deprived of the software's use because Vukovich illicitly copied the software without impairing IMI's ability to use it.

If Vukovich is using the software without a proper license, it is up to the software's licensor, not IMI as licensee, to enforce licensing rights. *See, e.g.,* Robert A. Gorman, *Copyright Law* 102 (Fed.Jud. Ctr.1991). But Coleman and IMI still

claim damages relating to "the data inputted and/or generated with the use of RPMS." Reply Br. p. 28. These damages would not be proper in the causes of action for conversion, trespass or replevin, which relate only to the chattels themselves. Any claims Coleman and IMI would have relating to appropriation of information on the RPMS software would be covered in the trade secrets claim, which was properly dismissed by the trial court. Because Coleman and IMI claim no proper damages in relation to the RPMS software, the trial court erred in declining to grant summary judgment in favor of Vukovich and Alliance on that claim.

This court affirms the trial court's summary judgment in favor of Vukovich and Alliance in No. 64D02–0207–PL–5726.[7] It reverses the denial of summary judgment to Vukovich and Alliance in No. 64D02–0206–PL–5119 in relation to the RPMS software. In all other respects, it affirms the denial of summary judgment in No. 64D02–0206–PL–5119. This matter is remanded for further proceedings consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

KIRSCH, C.J. and NAJAM, J., concur.

7. Coleman and Alliance did not appeal the summary judgment against them in No. 64D02–0207–PL–5727.